UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22 CV 156 JMB |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On October 2, 2019, Plaintiff Shawn G. filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et* seq. (Tr. 208-215). In his application, he alleged that he became disabled on March 3, 2002 because of epilepsy, scoliosis, schizophrenia, depression, and psychosis (Tr. 238). Plaintiff amended his onset date to July 3, 2019 (Tr. 224). After Plaintiff's applications were denied on initial consideration (Tr. 138-143), and reconsideration (Tr. 145-150), he requested a hearing from an Administrative Law Judge (ALJ) (Tr. 152-154).

Plaintiff and counsel appeared for a hearing on March 18, 2021 (Tr. 43-63). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Susan Johnson. The ALJ issued a decision denying Plaintiff's application on June 2, 2021 (Tr. 23-38). The Appeals Council denied Plaintiff's request

for review on December 23, 2021 (Tr. 1-4).   Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.    Disability and Function Reports and Hearing Testimony

Plaintiff was born in December 1978 and was 40 years old on the alleged amended onset date.  (Tr. 178).  As of March, 2021, he lives with his wife, mother, and 4 children under the age of 15 in a house owned by his mother-in-law (Tr. 52).  He completed 8th grade and has not acquired a GED (Tr. 53).  He had past jobs in construction and earned between $174.38 to $13,381.02 with no earnings from 2008 to 2015 (Tr. 54, 217).

Plaintiff's October 2019 Function Report was completed by Plaintiff and his wife (Tr. 245). In the report, Plaintiff paints a dire picture:  he states that he can only sit/stand for 15 minutes at a time, he feels sick, has migraines and seizures, cannot get along with others, hears voices in his head, cannot differentiate reality from fiction, and has a painful back (Tr. 245).  These conditions cause him to lay in bed, stay housebound, vomit, have seizures, lose feeling in his legs and lower body, and sleeplessness (Tr. 246).  He needs assistance with personal care, only has one bowel movement a month, forgets to clean himself, forgets to take his medicine, never cooks, and does not do housework or yard work, nor does he shop or manage money (Tr. 246-247).  He leaves the house twice a month for doctor's appointments but does not drive (Tr. 248).  He has no social life, no hobbies, does not spend time with others, nor does he go places (Tr. 249).  As to his functional limitations, he indicates that he has problems in all areas of functioning, he cannot follow written instructions, and he has paranoid thoughts of others harming him in addition to anger issues (Tr. 250).  The only activities he reports are walking a block prior to resting and paying attention for

two minutes at a time (Tr. 250).   He took Levetiracetam, Mirtazapine, Olanzapine, Movantix, and Oxycodone/Acetaminophen for his conditions (Tr. 251).

Plaintiff testified at the March 2021 hearing that he cannot work because of a back condition and his inability to "get along with people" (Tr. 55).   He lays in bed most of the day because of back pain; he testified that he has scoliosis, that he "had a break in it and it's been hurting ever since," and that he is afraid to have surgery in light of his seizures (Tr. 56).   He mostly lays in bed during the day, he does no chores, his wife helps him bathe, and he has no hobbies or other activities (Tr. 56-57).   He has paranoid thoughts two or three times a day and starts fights or arguments with others (Tr. 57).   He leaves the house about once a month, his wife handles his finances, and she assists him with medical appointments (Tr. 58-59).

Vocational expert Susan Johnson was asked to testify about the employment opportunities for a hypothetical person of Plaintiff's age and education with no past relevant work experience who was able to perform work at the light exertional level.   The person could occasionally climb ramps and stairs; should never climb ladders, ropes, or scaffolds; could occasionally stoop; should avoid hazards such as unprotected heights and moving mechanical parts; could perform simple routine tasks with minimal changes in job duties and job setting; should avoid fast paced production work; could meet end-of-day quotas; and, could only interact occasionally with the general public, supervisors, and coworkers (Tr. 60).   According to Ms. Johnson, such an individual would be able to perform jobs available in the national economy, such as shipping and receiving weigher, routing clerk, and document specialist (Tr. 61).

If the hypothetical individual was off task more than 10 percent during a workday or would miss work two or more days per month due to mental health symptoms, it would preclude employment (Tr. 61-62).

B.      **Medical and Opinion Evidence**

Plaintiff focuses on his mental health, especially his depression and psychosis (Doc. 15). Accordingly, the Court will focus on these aspects of his medical condition.[1]

The medical records reveal that in January, 2019, Dr. Ritesh Gandhi (a treating neurologist) referred Plaintiff to a psychiatrist to address his mental health concerns including depression, mania, and psychosis (Tr. 311, 323). Prior to this time, Plaintiff had sought medical care for a variety of conditions, including seizures, anxiety, pain, constipation, and dental issues, and he was taking medications including Cetirizine HCL, Flonase, Keppra, Movantix, Oxycodone, and Wellbutrin (Tr. 325-326). These medications are used to treat allergies, seizures, constipation, pain, and depression. Plaintiff continued to be seen for these conditions during the relevant time-period. Those records will be discussed as necessary.

Beginning in May, 2019, Plaintiff started treatment for his mental health with Dr. Jaron Asher of Family Care Health Center (Tr. 498).[2] Plaintiff's appointments occurred every 4 to 6 weeks throughout 2019, 2020, and 2021 (with the later visits by telephone or videoconference due to the COVID-19 pandemic).

At his first visit on May 30, 2019, Dr. Asher outlined Plaintiff's social history and noted his active major depression and psychosis not due to substance or known physiological condition (Tr. 311). At the encounter, Plaintiff stated that he hallucinates, hears voices, is irritable, sleepless, has pain, and starts fights; he also has no interests, low energy and poor concentration; and he had a previous suicide attempt but did not provide details (Tr. 311-312). Dr. Gandhi had started him

---

[1] Plaintiff does not challenge the ALJ's finding that his back condition was not disabling because it was treated conservatively, objective medical testing generally found normal range of motion and other normal results, and no surgical intervention had been attempted.

[2] Plaintiff had missed two previous appointments at the beginning of the year.

on Sertraline, but Plaintiff did not know for what condition (Tr.  311).   Plaintiff appeared well dressed but unshaven, he had fair eye contact, linear thoughts about his symptoms, normal physical movements, and was alert and oriented; but he had a restricted affect (Tr. 313).   At the time, Plaintiff was taking Keppra (for seizures), Oxycodone (for pain), and, as stated above, Sertraline (for depression) (Tr. 313).   At this encounter, Dr. Asher assessed him with "psychosis not due to substance or known physiological condition" and "disorder of adult personality and behavior" (Tr. 314).   He prescribed Risperidone for his mental disorder and told him to taper off Sertraline (Tr. 314).   Plaintiff was directed to return in 1-2 months (Tr. 314).

On July 11, 2019, Plaintiff reported hearing voices, depression, back problems, trouble getting out of bed, and mood swings – he indicated that Risperidone was not working (Tr. 308). Plaintiff appeared well groomed and dressed appropriately, had normal speech, fair eye contact, he was alert and oriented, and had linear thoughts about his symptoms; however, he had a constricted affect (Tr. 310).   At this encounter, Dr. Asher continued with his assessment of psychosis and personality disorder as set forth above; he also increased the Risperidone dosage and added Mirtazapine (Tr. 310).

On August 20, 2019, Plaintiff represented that he had no seizures and that he was compliant with his medication (Tr. 305).  However, he also reported mood swings, paranoia, sleeplessness, and anger that were not helped by medication (Tr. 305).  At the time he was taking Cetirizine, Keppra, Mirtazapine, Risperidone, and Oxycodone (Tr.307).   He appeared well groomed, alert, and oriented, had normal speech, and linear thoughts about his pain; but he had a headache, a constricted affect, and had paranoid thoughts (Tr. 306).   These observations of Plaintiff's physical and mental state generally continued throughout Dr. Asher's treatment.   At this encounter, Dr. Asher assessed him with "major depressive disorder, recurrent, in remission, unspecified with

psychosis," his Risperidone was discontinued, he was started on Olanzapine, and directed to follow up in 6 weeks (Tr. 307). This new assessment/diagnosis continued throughout the remainder of Dr. Asher's treatment.

On October 3, 2019, Dr. Asher reported the same information as contained in previous assessments (Tr. 428). Dr. Asher increased his Olanzapine dosage (to 10 mg) and directed him to return in 8 weeks (Tr. 429). By the end of the year, on December 12, 2019, his assessment was unchanged, his Olanzapine dosage was increased (to 15 mg), and Duloxetine (to treat depression) was added (Tr. 425).

In January, 2020, Plaintiff again reported a depressed mood, poor sleep, pain, poor concentration, and paranoia (Tr. 416). He presented similarly to his presentation throughout 2019 except that his affect was described as "constricted, low" instead of just constricted (Tr. 417). He was directed to continue Olanzapine and Duloxetine and told to return in 3 months (Tr. 418).

At a March 25, 2020 follow up (this and future visits were conducted remotely), Olanzapine was increased to 20 mg but Plaintiff was directed to discontinue Duloxetine (Tr. 409). He returned on April 8, 2020 and Dr. Asher noted that he sounded less anxious than before, was pleasant and cooperative, alert, attentive and oriented, had organized thought processes, was less paranoid, and had adequate judgment about safety; but Plaintiff indicated that he was "freaked out" (Tr. 395-396). He was directed to continue Olanzapine at 20 mg and return at the end of the month (Tr. 396). He had a similar mental status exam on April 30, 2020, still sounded anxious, and indicated "I panic" (Tr. 389). His medication was continued. In 2020 it also appears that Plaintiff began medication, Propranolol, for anxiety (Tr. 390).

On June 2, 2020, Dr. Asher increased Olanzapine to 30 mg, discontinued Propranolol and replaced it with Gabapentin (Tr. 383). It is unclear from the record why the medication changed;

Dr. Asher did note, however, that Plaintiff's paranoia increased, and he only slept 4 hours a night (although it was noted that he naps during the day and Dr. Asher suggested he use white noise at night) (Tr. 380, 383).   By August 27, 2020, Plaintiff reported paranoia and panic with anxiety (Tr. 464).  He indicated fear of contracting COVID-19 and that his paranoia increased when he leaves the house (Tr. 464).  He was directed to continue Olanzapine (which was at its maximum dosage) and Gabapentin was increased to 300 mg (Tr. 466).  At the next visit on October 15, 2020, Plaintiff reported that his paranoia and "voices" were better, that he had a panic attack while attempting to go to a store, and that he stays in bed a lot (Tr. 460).   Olanzapine was again continued, Gabapentin was increased to 400 mg, and he was started on Hydroxyzine as needed for anxiety (Tr. 463).  A month later he reported paranoia and delusions, but not as bad as before, and anxiety; his medications were continued with an increase to 50 mg of Hydroxyzine (Tr. 459).  At this visit, Plaintiff indicated that his wife wanted him to go to the hospital because his paranoia, violence, and hallucinations increased (Tr. 456).  In discussing these symptoms, Plaintiff related them to the challenges of isolating with family during the pandemic (Tr. 456).  By the end of the year, Dr. Asher had an unscheduled appointment because Plaintiff's wife still wanted him to go to the hospital due to agitation and paranoia (Tr. 452).   Dr. Asher prescribed Haloperidol for paranoia/agitation, continued Olanzapine, Gabapentin, and Hydroxyzine (Tr. 455).  There is no suggestion in the record that Dr. Asher believed he should be hospitalized or that Plaintiff did go to a hospital for his mental health.

On January 13, 2021, Dr. Asher examined Plaintiff through video-conference (Tr. 448).  At this encounter, Plaintiff's wife reported that he was quieter, "not flipping out as much" and sleeping better (Tr. 448).  Plaintiff reported that his paranoia was better (Tr. 448).  He appeared alert and attentive, oriented, had an affect that was at his baseline, had organized thoughts, had

decreased paranoia, and had adequate judgment although he still stated he was anxious (Tr. 449).

Olanzapine was continued along with the other medications (Tr. 451).  In the final record dated

February 23, 2021 (again by video-conference), Plaintiff reported less paranoia, that "he is no

longer going off on people," and that he is more relaxed, but that he still hears voices (Tr. 491).

Previously, Plaintiff started Chantix to assist with smoking cessation but, as warned by Dr. Asher,

he had "mental side effects" from the medication and it was discontinued (Tr. 491).  Dr. Asher

reported that Plaintiff was alert and attentive, oriented, at his baseline for affect, had organized

thoughts, decreased paranoia, and adequate judgment for safety; though he still reported anxiety

(Tr. 492).  Dr. Asher discontinued Gabapentin, continued Haloperidol for paranoia as needed,

continued Olanzapine, and continued Hydroxyzine for anxiety (Tr. 494).

Dr. Asher's April 13, 2021, Mental Medical Source Statement indicates that Plaintiff has

marked limitations in maintaining emotional stability, doing tasks without losing self-control,

relating to family and caregivers, and avoiding excessive argumentativeness (Tr. 496).  He would

miss work and need to leave work early at least 3 time per month and his pace of production would

be more than 50% below average (Tr. 497).  Dr. Asher notes that Plaintiff was on a maximum dose

of Olanzapine for his psychosis but that it was not controlling his symptoms and that Haloperidol

had to be added (Tr. 498).  Finally, Dr. Asher stated that "[h]is paranoia is his biggest impediment

to his gainful employment as it causes conflict with others" (Tr. 498).

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, a claimant must prove that he is disabled under the

Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall

v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to

establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."  Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside

the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 23-38).  The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 3, 2019, the application date (Tr. 25).  At step two, the ALJ found that Plaintiff had the severe impairments of major depressive disorder, degenerative disc disease, and epilepsy.  (Tr. 25).  The ALJ further found that the condition schizophrenia was not diagnosed and is a non-medically determinable impairment (Tr. 25).  The ALJ further found that "it is clear that the claimant's treatment provider attributes the claimant's psychosis to his depression and does not consider it a separate independent impairment" and included this condition with the severe impairment of major depressive disorder (Tr. 25-26).  The ALJ determined at step three that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  The ALJ specifically addressed listings 1.15 and 1.16 (spinal impairments); 11.02 (seizure disorder); and, 12.04 (depressive disorders) (Tr. 26-28).  As noted above, Plaintiff does not challenge the ALJ's assessment of his physical impairments or schizophrenia but does argue that the ALJ improperly found that psychosis was not an independent medical condition that met the Listing.

The ALJ next determined that Plaintiff had the RFC to perform light work except that he can only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; he can occasionally stoop; and that he should avoid exposure to workplace hazards, such as unprotected heights and moving mechanical parts. The ALJ further found that Plaintiff is limited to completing simple, routine tasks with minimal changes in job duties and setting; that he should avoid fast-paced production work but that he can meet end of day quotas; and that he is limited to occasional interaction with the general public, supervisors, and coworkers (Tr. 28-29).  In assessing Plaintiff's RFC, the ALJ summarized the medical record; written reports from Plaintiff; Dr. Asher's assessment; other past assessments; and, Plaintiff's testimony regarding his abilities, conditions, and activities of daily living (Tr. 29-36).

At step four, the ALJ concluded that Plaintiff had no past relevant work; that his age on the alleged onset date placed him in the "younger individual" category; and that he has a limited education (Tr. 36).  The transferability of job skills was not an issue because Plaintiff has no past relevant work.  The ALJ found at step five that someone with Plaintiff's age, education, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely shipping and receiving weigher, routing clerk, and document specialist. (Tr. 37).  Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from July 3, 2019 to June 2, 2021 — the date of the decision.  (Tr. 37-38).

## V.  <u>Discussion</u>

Plaintiff makes two related arguments: that the ALJ erred by failing to determine that he met Listing 12.04 and by failing to consider whether he also met Listing 12.03; and, that the ALJ failed to properly evaluate whether Plaintiff had marked limitations in Paragraph B criteria of interacting with others and concentration, persistence, and pace (Doc. 15).   Defendant counters

that even if the ALJ did not specifically consider Listing 12.03 independently, Plaintiff is still not entitled to benefits because the ALJ's consideration of the Paragraph B criteria, which applies to both Listings, is supported by substantial evidence.  When the record is considered as a whole, substantial evidence supports the ALJ's findings even if she did not specifically consider Listing 12.03.  Cronin v. Saul, 945 F.3d 1062, 1067 (8th Cir. 2019) ("We find that there is substantial evidence in the record to support the ALJ's finding that Cronin is not disabled within the meaning of the Social Security regulations and listings, regardless of which Section 12 mental disorder listing was considered.").

Social Security Listings describe various physical and mental impairments that are "presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt P, App. 1.  If a claimant's condition meets a Listing or if he has an impairment that is equal to a Listing, he is presumed qualified for benefits. Id.  Listing 12.00 describes mental disorders and the medical (Paragraph A) and functional (Paragraph B) criteria that are used to determine whether a claimant meets the Listing.  Listing 12.03 describes "Schizophrenia spectrum and other psychotic disorders" whereas Listing 12.04 describes "Depressive, bipolar, and related disorders."  With both Listing 12.03 and 12.04, there are four Paragraph B functional criteria:

> 1. Understand, remember, or apply information (paragraph B1). This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. . . .
>
> 2. Interact with others (paragraph B2). This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. . . .
>
> 3. Concentrate, persist, or maintain pace (paragraph B3). This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. . . .

4. Adapt or manage oneself (paragraph B4). This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. . . .

20 C.F.R. pt. 404, subpt P, App. 1, § 12.00(E)(1-4).  In order to meet Paragraph B requirements of either Listing, Plaintiff must have an extreme limitation in one category or a marked limitation in two categories.  Id. § 12.00(A)(2)(b).  An extreme limitation is one where the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis" and a marked limitation is one where the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  Id. § 12.00(F)(2)(d) and (e).  The burden is on the Plaintiff to demonstrate that his condition meets a Listing and satisfies both the Paragraph A and Paragraph B criteria.  Schmitt v. Kijakazi, 27 F.4th 1353, 13581359 (8th Cir. 2022).

Plaintiff specifically argues that the ALJ failed to properly evaluate two Paragraph B criteria: limitations in interactions with others and concentration, persistence, and maintaining pace.  As to the first criteria, the ALJ found that:

> In interacting with others, the claimant has a moderate limitation. The claimant alleges difficulty getting along with others, leaving his house, going out alone, socializing, getting along with authority figures, and handling stress and changes in routine.  However, by the claimant's statements or actions, he can live with others.  Further, while the claimant on occasion reported thoughts of hurting others and delusions, mental status exams consistently show no homicidal ideation, no hallucinations or delusions, alert, attentive, and oriented demeanor, cooperative behavior, normal speech, fair eye contact, constricted/anxious affect, and linear thoughts, with his reported panicky mood and paranoia greatly improved on appropriate medication.  Accordingly, the claimant has moderate, but not marked, limitation in this domain.

(Tr. 27 (citations to the Record omitted)).  As to the second criteria, the ALJ found that:

> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant alleges hallucinations, delusions, paranoia, suicidal/homicidal ideation, an inability to perform personal care, taking medication without reminders, going out alone, socializing, completing tasks,

> concentrating, understanding, and following instructions. However, by the claimant's statements or actions, he can pay attention for two minutes. Further, mental status exams consistently show fair/adequate insight and judgment, alert, attentive, and oriented demeanor, normal speech, fair eye contact, and linear thoughts. Accordingly, the claimant has moderate, but not marked, limitation in this domain.

(Tr. 27-28 (citations to the Record omitted)). The ALJ went on to note that Plaintiff's mental conditions did not result in in-patient care or hospitalization and that, while Plaintiff reported various conditions related to his mental health (hallucinations, anxiety, paranoia) his mental status exams were "fairly normal with no extreme finding" (Tr. 30). The ALJ pointed out that his depression was considered in remission in late 2019 and his mental status examinations were generally unchanged (Tr. 31). He reported doing better and sleeping better in 2021 after various changes in his medication; and, as the ALJ outlined, while he still had issues with anxiety and paranoia, he was alert, attentive, and exhibited adequate judgment (Tr. 32). Contrary to Plaintiff's argument, the ALJ did not simply "cherry pick" favorable information in her opinion but outlined the conditions, symptoms, medication, and results that are contained in the record. In doing, so the ALJ appropriately weighed the evidence and reached a conclusion that is supported by substantial evidence.

Plaintiff goes on to argue that the ALJ erred in finding that Plaintiff does not have marked limitations when she relied on Plaintiff's statement that he can concentrate for two minutes, parsed out mental status examination findings that demonstrate Plaintiff's disabling impairments, and failed to credit Dr. Asher's opinion that Plaintiff has marked limitations (Doc. 15, p. 7-8). Plaintiff's arguments, however, ask the Court to do what the Eighth Circuit has cautioned the Court not to do – reweigh the evidence and find a contrary result, even if that result also can be supported by substantial evidence. See Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017).

In determining that Plaintiff did not meet the Paragraph B criteria, the ALJ considered that Plaintiff was able to live with his wife, mother, and four school-aged children, belying a finding that he had marked limitations in interacting with others (Tr. 27).  During a majority of his mental status examinations and other medical examinations, Plaintiff was alert and cooperative, an indication that he was capable of effectively interacting with his doctors and pay attention and stay on task for more than two minutes at a time.  While Dr. Asher found that Plaintiff had marked limitations, the ALJ could rely on Plaintiff's routine and consistent mental health treatment, that did not involve extreme treatment or hospitalization, to negate the marked functional limitations advocated by Dr. Asher.  See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating that the ALJ properly considered conservative medical treatment in evaluating plaintiff's claims); Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 at *9 (S.S.A. Oct. 25, 2017) (stating that "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").  And, to the extent that Plaintiff asks the Court to draw a different conclusion as to Plaintiff's treatment notes, "[t]he interpretation of physician's findings is a factual matter left to the ALJ's authority."  Mabry v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016).

Plaintiff further takes issue with the ALJ's recitation of the evidence and points out that various treatment notes contained a mixed bag of information: Plaintiff is at once alert and oriented and behaving appropriately with efficacious results from various medication; and also anxious, paranoid, animated, and with a constricted affect for which Dr. Asher modified his medication. As Plaintiff rightly points out, throughout his treatment, he continued to discuss his anxiety,

paranoid thoughts, occasional suicidal thoughts, and occasional thoughts of hurting others.  While the undersigned may have evaluated the evidence differently, the ALJ's conclusions are supported by substantial evidence and are entitled to deference.   See, e.g., Dols v. Saul, 931 F.3d 741 (8th Cir. 2019) (in this case, the majority and the dissent outlined the significant evidence that detracted from the ALJ's opinion that the claimant was not disabled; however, the majority affirmed the decision because the court may not reweigh the evidence or try the case de novo.).

As outlined above, the ALJ relied on evidence that Plaintiff was able to live with an extended family, that he was routinely cooperative and alert at mental status and physical examinations, that his medications were at least somewhat efficacious, and that he had limited and conservative treatment for his conditions, in finding that Dr. Asher's significant limitations were not supported by the record as a whole.  While Plaintiff states that Dr. Asher found that he was at the maximum level of efficacy as to one particular medication, Olanzapine, which necessitated the addition of Haloperidol (Tr. 498), there is no indication from Dr. Asher that the Olanzapine *and* Haloperidol were insufficient to manage Plaintiff's symptoms.  And, as pointed out above, Dr. Asher increased or changed Plaintiff's medication without any significant changes in his assessment of Plaintiff's condition – an observation made by the ALJ (Tr. 30 ("mental status exam was again fairly normal); 31 ("mental status exam was unchanged and remained fairly normal"; "mental status exam was again unchanged and fairly normal with no extreme findings"); 32 ("His mental status exam was essentially unchanged and normal . . . .")).  Certainly, conditions that are controlled or managed with treatment are not considered disabling.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  And the ALJ may discount Dr. Asher's opinion if it is inconsistent with his treatment notes.  See Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017); Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)

("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.").

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of March, 2023.